[Nos. 27517, 27518.  *En Banc.*  November 1, 1939.]

JAMES R. CHADWICK *et al., Respondents,* v. LOUIS EK *et al., Appellants.*

MARTHA Y. BENOIT, *as Executrix, Respondent,* v. LOUIS EK *et al, Appellants.*[1]

[1]Reported in 95 P. (2d) 398.

*Ballinger, Hutson & Boldt,* for appellants.

*George F. Hannan,* for respondents Chadwick *et al.*

*Little, Burgunder & Smith* and *Eugene O. Forest,* for respondent Benoit.

STEINERT, J.—This is a consolidated appeal of two cases wherein the respective plaintiffs sought to recover damages resulting from an automobile accident alleged to have been caused by the negligence of defendant husband. Defendants denied liability and affirmatively pleaded contributory negligence, which, in turn, was denied by plaintiffs. The cause of plaintiffs Chadwick

was tried before a jury and resulted in a verdict in their favor. The cause of plaintiff Benoit was thereafter submitted to the court as a nonjury case upon a stipulation that the evidence in the Chadwick case, in so far as it was applicable, should be considered as evidence in the nonjury case, and that either of the parties might submit additional evidence. At the conclusion of all the evidence in that cause, the court made findings, drew conclusions, and entered judgment for plaintiff Benoit. The defendants having given notice of appeal, it was stipulated that the two cases should be consolidated and that defendants' challenge to the sufficiency of the evidence, their motion for directed verdict, and their motion for judgment notwithstanding the verdict, in the Chadwick case, should all be deemed as having been made and similarly disposed of in the Benoit case.

Upon the appeal, the only contention urged by appellants is that their motions for judgment notwithstanding the verdict, or decision, should have been granted on the ground that the injured persons were guilty of contributory negligence as a matter of law. An adjudication of that issue requires an understanding of the facts, which, necessarily, must be considered in the light most favorable to respondents.

The accident occurred on the morning of January 5, 1938, at about eight-thirty o'clock, at a point approximately two and one-half miles north of the city limits of Renton, on the Dunlap Canyon road, which is a main highway extending in a northerly direction from Renton to Seattle. There is considerable traffic between the two cities during both day and night, the peak of the morning traffic being at about eight or eight-fifteen o'clock.

The highway consists of two parallel paved roadways, each twenty feet wide, separated by a four-foot

graveled strip. A yellow line divides each of the paved roadways into two lanes of equal width. Both lanes of the east roadway are for use by Seattle-bound traffic, and both lanes of the west roadway are for use by traffic proceeding towards Renton. Bordering the outer edge of the east roadway is a concrete gutter about eighteen inches wide, but so constructed that cars may easily pass over it. Adjacent to the gutter on its east side is a dirt shoulder varying from four and one-half to seven feet in width. The shoulder slopes sharply into a ditch two feet nine inches deep.

For a distance of about one thousand feet south of the place of the accident, the road is straight, with a five per cent down grade toward the north. About a quarter of a mile south of the crest of the hill in the direction of Renton is an inn called "Herman's Hamberger," and a short distance further south there is another place called "The Antlers." There are stores and houses at various points along the highway, but none in the immediate vicinity of the place with which we are here concerned, nor are there any road approaches, intersections, or fixed obstructions in that particular neighborhood.

On the morning of January 5, 1938, a heavy fog developed along the Dunlap Canyon road, and the atmospheric condition was such as to cause the moisture to freeze on the outside of the windshields of moving vehicles. With a clear windshield, the visibility of an automobile driver was about one hundred feet, but with the formation of the ice on the windshield, his vision would be considerably decreased, and, as the ice tended to form rapidly, it was necessary to clean the windshields frequently in order to attain the maximum possible visibility.

At about eight o'clock on the morning in question, Mrs. Chadwick, whose home was in Renton and about

four miles from the scene of the accident, started for Seattle, intending to drive to the University of Washington, where she was registered as a student in pharmacy. She drove at the rate of about twenty miles an hour. At a point approximately two and one-half miles north of Renton, she was overtaken and sideswiped by a car driven by Raoul S. Benoit. Both drivers brought their cars to a stop and alighted to examine the possible damage to Mrs. Chadwick's car and to exchange identifications. While engaged in conversation at the rear of the Chadwick car, they were struck by an automobile operated by appellant Louis Ek, who was also driving towards Seattle. Mr. Benoit was killed, and Mrs. Chadwick was seriously injured. It appears that Ek's windshield had become totally clouded by fog and ice, and consequently, he was endeavoring to guide his car by watching the yellow line in the middle of the northbound traffic lane; in order to follow the line, he was leaning partially out through the opened left front window of his automobile.

Concerning the events leading up to the collision, Mrs. Chadwick testified as follows:

"Q. (Mr. Hannan) Now that morning you were going to Seattle? A. Yes, sir. Q. What time did you leave Renton? A. Oh, it was sometime after eight. I couldn't say exactly. I didn't look at my watch. Q. Tell the jury what happened between the time you left your own home at Renton and the time when this accident happened. A. I went out to the runway to get my car, and I cleaned the windshield, and then I drove through town and out beyond the city limits of town, and stopped at a service station and cleaned the windshield again, because it started to fog up, and I couldn't drive with a fogged windshield, and I went up the hill on the Dunlap Canyon road, and there was still fog, and at a place called the Antlers I drove off the side of the road and cleaned

my windshield again, which was the second time, and then I got to the top of the hill where Herman's Hamberger stand is, and I drove off on the gravel, to be off the road, and cleaned it again, and as you leave there there is a crest of the hill, down grade, a sort of a slope, and as I was going down that slope Mr. Benoit came along and sideswiped the rear of my car, and I knew the law was you have to exchange information with anyone involved in an accident, and I put the car off the road as far as I could get it safely, because there was a shoulder with a ditch down below, and I put the car off, and I went to look at the damage, and then that car hit me. That is all. Q. As you remember it, Mrs. Chadwick, where were you at the time? A. On the shoulder of the road. Q. Where was your car parked? A. I thought not over 18 inches, I would say; as far as I could get it, but I don't think it was over 18 inches. I didn't measure it, of course. Q. On the pavement, you mean? A. Yes, sir. The rest of it was off on the shoulder of the road."

The positions of Mrs. Chadwick and Mr. Benoit at the time of being struck are, of course, of vital importance in the determination of this issue. Their purpose in taking the positions that they did is also a material element. Those matters will be considered more fully a little later.

Upon cross-examination, Mrs. Chadwick testified definitely and specifically concerning her familiarity with the road, her knowledge of the atmospheric conditions, and the precautions that she had taken prior to the time of the accident. Her testimony disclosed the following: She had frequently driven over the road and was thoroughly familiar with it and with the character and extent of travel upon it. She was aware of the fog and of the fact that ice was forming on the windshield of her own automobile, and knew that other drivers would naturally experience the same difficulty. Her visibility with a clear windshield

was about one hundred feet. Within a distance of four miles, she had stopped three times to clean her windshield. Upon each of those occasions, she drove entirely off the road, and stood clear of the pavement.

Owing to the death of Mr. Benoit, his knowledge of the road and the precautions taken by him are not as definitely known. It appears, however, from the testimony of Roy Gustaves, a disinterested witness, who accompanied him on the trip, that Mr. Benoit worked at Auburn, which is south of Renton, and that he was on his way to Seattle in the midst of the same fog and under the same circumstances that had required Mrs. Chadwick to clean her windshield three times within a comparatively short distance.

Following the impact of the Benoit car against the side of Mrs. Chadwick's car, Benoit drove ahead a distance of from seventy-five to one hundred twenty-five feet and parked with all but the left rear portion of his car on the shoulder of the road. Mrs. Chadwick came to a stop more quickly and parked with the left portion of her car projecting over the pavement to the extent, as estimated by her, of about eighteen inches, and by others as being almost to the middle of the north bound traffic lane. Neither of the cars, however, was disabled by the impact, and none of the occupants was injured thereby. Mr. Benoit and Mrs. Chadwick then both alighted from their cars and, after inspecting the left side of Mrs. Chadwick's car and finding that the damage was slight, walked to the back of the Chadwick car for the purpose of exchanging license identifications. Benoit stood on the pavement with his back to traffic moving in the lane upon which he was standing. Mrs. Chadwick stood east of him, but, according to the verdict of the jury, on the pavement. She was facing diagonally in what would be a north-

westerly direction with her left side and part of her back towards the south.

With reference to the care exercised by Mrs. Chadwick and Mr. Benoit to avoid the danger of being struck by approaching vehicles, Mrs. Chadwick testified as follows:

"Q. And as you stood there and he stood there, in which direction were you facing? A. I was facing Mr. Benoit. I think—I cannot recall exactly, but I imagine I would be turned partially this way (indicating), because I had to face him in order to talk with him. Q. You would be facing partially toward your car and partially toward Mr. Benoit? A. It would be more like away—I don't know. I imagine— in the excitement it would be impossible to tell exactly. Q. But in a general way you were standing there at the rear of your car, looking generally toward— A. Toward Mr. Benoit. Q. Toward the rear of your car and toward Mr. Benoit? A. I had already looked at the rear of my car. I was not concerned in that any more. Q. You were standing with your back toward approaching traffic? A. Maybe not my whole back, but I was not facing traffic. Q. You did that the whole time? A. I did part of the time. As anyone would do, unconsciously you would turn your body, but that is impossible to state now. Q. Did you at any time look up the highway toward Renton? A. When I was coming back to the west of my car I was looking constantly then, because I was facing that way. Q. You are speaking of the time— . . . A. I got out of my car on the driver's side, which would be in approximately a westerly direction, and turned and faced toward the rear of my car, which would be in an approximately south direction, and then I would be facing oncoming northbound traffic. Q. As you were walking alongside your car, but when you got back to the end of your car, then I understand you turned around and examined the back of your car? A. Yes, sir. Q. And stood in that position with Mr. Benoit facing in the direction you have described? A. I walked farther east to the right of my car. Q. By the time you got

to the rear of your car you did not look any further then toward Renton or south on the highway? A. When I was back of my car I assumed I was in a safe position. Q. That is not the question. A. No; I wouldn't be looking up there, because I thought I was safe. Q. But after you got back there you did not look any further toward Renton until after the impact, did you? A. After the impact I did not look. Q. The question was—I am sorry—I did not mean to give any offense. A. I was on the ground then. Q. I was not referring to that. I said until—from the time you got to the rear of your car until the impact you did not look any further up the highway toward Renton? A. Oh, I don't know. I was not conscious of it. Anybody would look around, you know; but I was not conscious of looking. Q. But in any event, from the time you did get to the back of your car you did not look continuously? A. No, sir; I did not look continuously. It would be intermittent. Q. Now the fog, as it existed there, continued throughout this entire time, did it not? A. It was a steady fog—what I call a steady fog —not pockets. Q. The fog continued in the same condition, it was, whatever the condition was? A. I would say so."

Roy Gustaves, who was Benoit's companion, was the only person that saw the entire occurrence. He was standing on the shoulder of the road within a few feet of Mrs. Chadwick. He testified that the right wheels of Mrs. Chadwick's automobile were stopped in the concrete gutter, leaving the greater portion of her car standing on the highway. He further testified that Benoit and Mrs. Chadwick, after examining the left side of her car, took positions in the rear of it, Mr. Benoit facing north and Mrs. Chadwick facing diagonally toward the northwest; that Benoit occupied substantially that position until he was struck by Ek's car, but that Mrs. Chadwick was walking toward the shoulder of the road and was still three or four feet out on the pavement at the time of the collision.

It is clear, from the evidence, that the only purpose of Mrs. Chadwick and Mr. Benoit in standing on the highway back of Mrs. Chadwick's car was to exchange names and license identifications, not for the purpose of ascertaining the damages to her car nor for the purpose of either repairing or removing it. The examination of her car had been completed, and the parties were then discussing matters which did not require them to be on the highway.

Mrs. Chadwick, and apparently Mr. Benoit, neither saw nor heard the approach of the Ek car. While they were in the respective positions just indicated, Ek's car, which was proceeding along the outer lane of the east roadway, suddenly ran into them. Ek, leaning out of his left window in order to follow the yellow line, did not observe the car ahead of him or the persons standing behind it until almost the instant of the collision.

Shortly after the accident, a police officer, who subsequently testified for Mrs. Chadwick, drove her car forward a short distance and, without difficulty, parked it wholly on the adjacent shoulder; this was done as a safety measure. The jury, in answer to a special interrogatory, found that Mrs. Chadwick was on the pavement at the time that she was struck; and the court found that Benoit, at the same time, was standing on the pavement in the rear of the Chadwick car.

We proceed now to a consideration of the question presented upon the appeal, namely, whether, under the circumstances shown, Mrs. Chadwick and Mr. Benoit, to whom we shall hereinafter refer as though they were the sole and actual respondents, were guilty of contributory negligence as a matter of law.

The rule upon the subject, as declared by this court, is that in only two classes of cases may the question of contributory negligence be determined by the

court as a conclusion of law: (1) Where the circumstances of the case are such that the standard of duty is fixed, and the measure of duty defined, by law and are the same under all circumstances; (2) where the facts are undisputed and but one reasonable inference can be drawn from them. *Bell v. Northwest Cities Gas Co.*, 164 Wash. 450, 2 P. (2d) 644; *Scott v. Pacific Power & Light Co.*, 178 Wash. 647, 35 P. (2d) 749; *Hayden v. Colville Valley Nat. Bank*, 180 Wash. 220, 39 P. (2d) 376. See, also, *Hinton v. Carmody*, 182 Wash. 123, 45 P. (2d) 32; *Corbaley v. Pierce County*, 192 Wash. 688, 74 P. (2d) 993.

Appellants take the position that respondents are precluded from recovery by both divisions of that rule. They contend, first, that respondents were guilty of contributory negligence as a matter of law because of their violations of certain sections of the Washington motor vehicle act, Laws of 1937, chapter 189, p. 835 (Rem. Rev. Stat., Vol. 7A, §§ 6360-1 to 6360-159 [P. C. §§ 2696-767 to 2696-908]). Section one of the act, p. 835 (Rem. Rev. Stat., Vol. 7A, § 6360-1 [P. C. § 2696-767]), defines "pedestrian" as "any person afoot." Section 99, p. 902 (Rem. Rev. Stat., Vol. 7A, § 6360-99 [P. C. § 2696-857]), requires that

"Pedestrians crossing a roadway other than at intersection crosswalks shall yield the right of way to all vehicles upon the roadway."

Section 101, p. 904 (Rem. Rev. Stat., Vol. 7A, § 6360-101 [P. C. § 2696-859]), provides that

"Pedestrians on any public highway where no sidewalk is provided shall proceed on the extreme left-hand side of the roadway and upon meeting an oncoming vehicle shall step to their left and clear of the roadway."

Respondents contend that these provisions do not apply to them.

Much can be said in support of either contention. It would seem that the spirit of the 1937 act contemplates one standing or moving about upon the highway as well as one crossing or proceeding along the course of it. But, in construing chapter 309, Laws of 1927, p. 802, § 41 (6), the language of which is almost identical with that of Rem. Rev. Stat., Vol. 7A, § 6360-101, we held in *Gooschin v. Ladd,* 177 Wash. 625, 33 P. (2d) 653, cited by respondents, that one standing on the edge of a road while engaged in servicing his disabled automobile was not a pedestrian within the contemplation of the 1927 act. It may be said, however, that the 1927 act did not define "pedestrian" at all; further, that, in that case, the automobile concededly was disabled, and the plaintiff was engaged in actually servicing it at the time of his being injured.

We do not think that the decision of this case need necessarily rest upon a determination of whether respondents were pedestrians, and, hence, we will not undertake at this time to construe the 1937 statute with reference to the definition of a pedestrian and the duties imposed upon him by the act.

Appellants next contend that respondents were guilty of contributory negligence as a matter of law, under the second division of the rule, in that they failed to exercise reasonable care under the existing conditions. With that contention, we must agree.

A person who stands upon a highway must exercise reasonable care for his or her own safety. Whether the person has complied with this requirement, must depend upon all the circumstances of the particular case. Among the elements to be taken into consideration are the type of the highway, its locality, the mode of travel, the amount of traffic, the time of the occurrence, the weather conditions then existing,

the purpose for which the parties were on the highway, and their opportunities to avoid injury.

The term "reasonable care" means that care which a reasonably prudent person would have exercised under the same or similar circumstances. *North Coast Power Co. v. Cowlitz, C. & C. R.,* 108 Wash. 591, 185 Pac. 615; *Scott v. Pacific Power & Light Co.,* 178 Wash. 647, 35 P. (2d) 749.

The doctrine of contributory negligence rests upon the principle that a person is never absolved from exercising reasonable and ordinary care for his own safety and cannot thrust all responsibility upon others. *Von Saxe v. Barnett,* 125 Wash. 639, 217 Pac. 62; *Garrow v. Seattle Taxicab Co.,* 135 Wash. 630, 238 Pac. 623, 45 A. L. R. 293; *Alexiou v. Nockas,* 171 Wash. 369, 17 P. (2d) 911.

In the case before us, respondents were well aware of the atmospheric conditions and their effect upon the visibility of others using the highway; they knew that the range of vision did not exceed one hundred feet even with a clear windshield, and that such vision would be reduced progressively as the moisture froze upon the windshield of a moving automobile; they knew that the highway was heavily traveled and that automobiles would be approaching at any moment, and that it was proper for northbound traffic to proceed along the very lane in which they were standing. Yet, in spite of this knowledge and the presence of a place of safety on the shoulder close at hand, they chose to occupy a position of danger while exchanging identifications, with their backs toward approaching traffic, and giving no attention whatever to the probability of oncoming vehicles. It seems to us that it must be said that respondents were not, under the circumstances, exercising that care which reasonably

prudent persons would have exercised under the same or similar conditions, and that their negligence contributed proximately to their injuries.

In the brief of respondent Benoit, it is argued that, he being dead, the rule of presumption of due care on his part should obtain. The fact is, however, that there was testimony as to every movement made by Mr. Benoit as he stood on the highway and there is therefore no room for the presumption. *Carlson v. Seattle,* 175 Wash. 388, 27 P. (2d) 717; *Trainor v. Interstate Const. Co.,* 187 Wash. 142, 60 P. (2d) 7; *Hamblet v. Soderburg,* 189 Wash. 449, 65 P. (2d) 1267.

The case of *Thornton v. Eneroth,* 177 Wash. 1, 30 P. (2d) 951, cited by respondents, is not controlling here for several reasons. (1) That case arose under the former statute which made it necessary to park a vehicle off the paved portion of a public highway only when it is "practicable," not *possible,* to remove it; (2) it was not possible, or even practicable, in that case to move the car, because of the peculiar conditions that then prevailed with reference to the shoulder of the road and the position of other cars in the highway; (3) the injured person was not at the time engaged merely in exchanging the statutory information; he was inspecting the damages to his car preparatory to having it towed to a service station; (4) on account of the adjacent snowbank, the plaintiff there was compelled to be on the road; and, finally, (5) as appears by the opinion, there was not only a most unusual weather condition but also great confusion by reason of successive collisions within a short period of time; hence, it could not be said, as a matter of law, that plaintiff was guilty of contributory negligence in occupying the position that he did. In the case at bar, the facts and circumstances were such as to call for but one conclusion. Respondents had every reason,

and likewise every opportunity, to take positions of safety while exchanging identification information, or else to maintain a careful lookout commensurate with the impending danger, neither of which they did.

If, as respondents seemingly contend, they were for a necessary purpose standing behind Mrs. Chadwick's car without keeping a lookout, still they would not be free from negligence.

Rem. Rev. Stat., Vol. 7A, § 6360-110 [P. C. § 2696-868], provides:

"It shall be unlawful for any person to stop, park or leave standing any vehicle, whether attended or unattended, upon the paved, improved or main traveled portion of any public highway outside incorporated cities and towns when it is possible to stop, park, or so leave such vehicle off such paved, improved or main traveled portion of such public highway : . . . *Provided,* This section shall not apply to the operator of any vehicle which is disabled upon the paved or improved or main traveled portion of any public highway in such a manner and to such an extent that it is impossible to avoid stopping and temporarily leaving such vehicle in such position." Laws of 1937, chapter 189, p. 908, § 110.

The former statute upon the subject, Rem. Rev. Stat., § 6362-47, did not include the word "stop," and for the word "possible" it used the word "practicable." Manifestly, the legislature definitely intended to prohibit the stopping of an automobile on a public highway when it is possible to remove it therefrom or unless the vehicle is so disabled that it is impossible to avoid stopping and temporarily leaving it on the highway. Cases dependent upon the former statute are therefore not in point.

Mrs. Chadwick's car was not disabled, and that it was possible, and even practicable, to remove it from the main highway, was amply demonstrated by the

fact that, shortly after the accident, it was driven forward under its own power a distance of about fifty feet, off the highway and onto the adjacent shoulder of the road.

Since the car was stopped on the highway contrary to the mandate of the statute, it afforded no justification to the parties to occupy the highway as they did while exchanging information. But whether the car was rightfully or wrongfully on the highway, still the parties were not compelled to occupy that position for the purpose assigned. They could have done that just as well in a position of safety beyond the edge of the road.

Finally, respondents contend that they are, in any event, entitled to recover under the doctrine of last clear chance. That doctrine has no application to the facts in this case. Appellant Ek never saw respondents until the moment of the collision, and at that time the negligence of respondents had not ceased. The applicable rule was clearly defined in *Leftridge v. Seattle,* 130 Wash. 541, 228 Pac. 302, as follows:

"Thus we have two different situations to which the last clear chance rule applies. In the one, the plaintiff's negligence may continue up to the time of the injury if the defendant *actually sees* the peril; in the second, the plaintiff's negligence must have terminated if the defendant did not actually see the peril, but by the exercise of reasonable care *should have seen* it."

See, also, to the same effect, *Zettler v. Seattle,* 153 Wash. 179, 279 Pac. 570; *Huber v. Hemrich Brewing Co.,* 188 Wash. 235, 62 P. (2d) 451.

The accident involved in this case was a most regrettable one; but, under the law upon the subject, as we construe it, we must hold that respondents were themselves negligent and that their negligence contributed proximately and materially to their injuries.

The judgments are reversed, with direction to dismiss the actions.

ROBINSON, SIMPSON, JEFFERS, and BEALS, JJ., concur.

MILLARD, J. (dissenting)—I agree with the prevailing opinion that an adjudication of the issue of contributory negligence—the only question before us—requires an understanding of the facts, and that, necessarily, the facts must be considered in the light most favorable to respondents.

If we follow the rule invoked by the majority, we can not, logically, arrive at any conclusion other than that the question whether respondents exercised reasonable care was a question for the jury; and we will not overrule, expressly or *sub silentio*, our prior opinions on the same question. These prior cases, on principle, are indistinguishable from the case at bar. A consistency between those prior opinions and the prevailing opinion in the case at bar has not been demonstrated by the majority.

In the majority opinion, it is stated that the respondents were well aware of the atmospheric conditions and their effect upon the visibility of others using the highway; that they knew that the range of vision did not exceed one hundred feet; that they knew that the highway was heavily traveled and that northbound traffic would proceed along the lane in which respondents were standing. The majority opinion then recites that, despite respondents' knowledge of their perilous position and the presence of a place of safety near at hand on the shoulder of the highway, the respondents chose to occupy a position of danger while exchanging identifications, with their backs toward approaching traffic and giving no attention whatever to the probability of oncoming vehicles. It is insisted in the majority opinion that, even if respondents were, as they

contend, standing for a necessary purpose behind Mrs. Chadwick's automobile, the respondents were not keeping a lookout; hence, that constituted contributory negligence as a matter of law and bars recovery. It is the holding of the majority, respecting the doctrine of last clear chance which respondents invoke, that that rule has no application in the case at bar, for the reason that appellant Ek never saw respondents until the moment of the collision, and at that time the negligence of respondents had not ceased.

The record does not sustain the majority's position that respondents were not giving any attention to the probability of the approach of northbound traffic. The testimony is not that respondents did not look. At the most, the testimony is that they did not gaze continuously. It should also be borne in mind that Ek's range of vision was from fifty to one hundred feet. In answer to the question, "During the time that you were standing in back of your car did you ever look toward Renton?" Mrs. Chadwick testified in the affirmative. She further testified:

"Q. From the time you got to the rear of your car until the impact you did not look any further up the highway toward Renton? A. Oh, I don't know. I was not conscious of it. Anybody would look around, you know; but I was not conscious of looking. Q. But in any event, from the time you did get to the back of your car you did not look continuously? A. No, sir; I did not look continuously. It would be intermittent."

Another witness testified as follows:

"Q. From the time they were standing in the positions you have just described, at the rear of the Chadwick car. Did they remain in those same positions, or substantially in those same positions, until they were struck by the Ek car? A. When they first came back they were at the side of the car, and then they went to the rear of the car. Q. From the time they

got to the rear of the Chadwick car, did they remain in those same positions substantially until they were struck by the Ek car?  A. Yes, sir.  Mrs. Chadwick was going off the highway.  Q. At what time?  A. Just before she was hit."

Mrs. Chadwick refused to state positively the exact position of Mr. Benoit.  She testified that he could not have been facing her car or he would not have been able to talk to her, but that he was turned sideways. The testimony is as follows:

"Q. And when you got out of your car on the left-hand side, and were out on the pavement of the highway, Mr. Benoit started back up the highway?  A. To meet me.  Q. And he met you at the car?  A. Yes, sir. Q. Mr. Benoit had another party with him?  A. Yes, sir.  Q. And you and Mr. Benoit came to the rear of your car?  A. I looked over the whole side of my car first, and then I went to the rear.  Q. And the damage caused to your car was very slight?  A. Very slight. Q. And in no way disabled your car?  A. No, sir.  As I found out on examination.  Q. It was not disabled? You were able to drive it, and, as a matter of fact, drove it after the bump, did you not?  A. Until I stopped it, yes, sir.  Q. But it was in no way disabled?  A. I would not say so, no.  Q. And then after having seen that the damage was very slight, and there was nothing disabled about the car, as I understand it, you then went to the back of your car?  A. Yes, sir.  Q. And Mr. Benoit and you were standing there and were preparing to exchange your names and license numbers, and so on?  A. Yes, sir.  Q. You had no other purpose in being there at that time, excepting merely to exchange names?  A. To comply with the state law. Q. No other purpose than to exchange information? A. No, sir.  Q. You telling him your name, and he telling you his, and taking numbers, and so on, is that correct?  A. That is correct.  Q. As I understand, as you were standing there Mr. Benoit took up his position immediately to the rear of the left rear corner of your car, didn't he?  A. After we had been over to the side.  Q. After you had been to the side of your

car, you came to the back end, and stood at the back end of your car with Mr. Benoit standing just back of the left rear corner? A. Somewhere in there. I couldn't state just where, but my car was—I don't know how to explain it—he wasn't out in the highway. Q. He was standing fully on the pavement on the highway? A. He was standing fully on the pavement, but he wasn't west of my car. I couldn't say exactly where he was. Q. But back of the left rear corner of your car? A. Yes, sir; about there. But I could not state his exact position. Q. And he stood there facing your car, did he not? A. I don't know how he was facing. Q. You were standing talking to him? A. Yes, sir. But I don't know whether he was faced— he could not be facing my car, or he would not be able to talk to me. He was headed toward the car. Q. He was not facing back toward Renton? A. I imagine he was turned sideways, but he wouldn't be facing the car. Q. He had his back in the direction from which traffic would be coming? A. I imagine so. Q. And he stood there in that same position all the time until he was struck? A. We were standing there. Q. The two of you in the position you have described? A. I didn't describe mine yet. Q. We will come to that in a minute. You have described his position until he was struck? A. As near as I can remember. I cannot say definitely."

There is no evidence that Mr. Benoit did not turn his head and glance backward over his shoulder. While there is testimony tending to establish the fact that he did not change the position of his feet, there is testimony that Mr. Benoit was standing sidewise at the time he was struck; that he was struck on his right side, and that all of his injuries were on the right side of his body.

Ek had a space of seventeen or eighteen feet in which to pass to one side of respondents' automobile. The range of his vision was from fifty to one hundred feet. Had he looked, if his windshield were clean, he could

have seen that automobile. He can not say that he did not see that which he was required to see and would have seen had he been looking. If Mrs. Chadwick and Mr. Benoit had been looking directly at the approaching automobile of Mr. Ek, the situation of respondents would not have been aided. They would doubtless have assumed, until the instant of collision, as they would have had the right to assume, that Ek would veer his automobile slightly to the left and pass the other automobile in safety. Whatever Mrs. Chadwick and Mr. Benoit did or did not do under the facts of this case, in no sense constitutes a proximate cause of the injuries. The proximate cause, the only proximate cause, was the gross negligence of Ek.

As stated above, the majority opinion recites that appellant Ek never saw respondents until he collided with them, and at that time the negligence of respondents had not ceased. There is no question as to the gross negligence of Mr. Ek. Whether respondents were in a position in the rear of their automobile as to place them without the range of appellant's vision, is beside the question. Let us assume, for the purpose of this argument, that neither respondent was or could have been seen near the automobile of respondents. If one negligently places himself in a dangerous situation upon the highway and a person in control of an automobile actually sees the traveler's situation and should appreciate his danger, the last clear chance doctrine would apply without regard to the continuing negligence of the traveler concurring with that of the operator up to the very instant of the injury. *Mosso v. Stanton Co.*, 75 Wash. 220, 134 Pac. 941, L. R. A. 1916A, 943.

It would hardly be argued by the majority that, if appellant Ek had seen the automobile of respondent and persisted in his course until he had collided with

that automobile, that the fact that he did not see in the automobile he struck, or near that automobile, a human being, that the last clear chance doctrine would not apply. Actual knowledge by the defendant of the peril of the occupant of the car or the person nearby, is not the *sine qua non* of the doctrine of last clear chance. Mr. Ek may not say that he did not see the automobile which he could have seen had he looked within time to veer to the left and avoid the collision. Neither in reason should he be absolved from liability for personal injuries sustained by the respondents because he could not have seen the respondents if he had looked, assuming they were in a position where Mr. Ek could not have seen them. He knew, or he is charged with knowledge, that an automobile directly ahead of him within one hundred feet of his range of vision would be struck by his automobile if he did not veer to the left. The last clear chance doctrine should be extended to a case wherein the situation of persons, as in the case of respondents, is such that the defendant is charged with knowledge that some human being is in a state of present peril. As we said in *Chapin v. Stickel*, 173 Wash. 174, 22 P. (2d) 190:

"Otherwise, though the engineer and fireman of a locomotive saw a stalled automobile on the railroad track within time to have averted a collision with such automobile, the *tort feasor* would be absolved from liability for personal injuries sustained in the collision by the occupants of the automobile, if the engineer and fireman did not see such occupants.

"It is not a condition precedent to the application of the doctrine of the last clear chance that the defendant have actual knowledge of the plaintiff's peril if, under circumstances such as obtain in the case at bar, the defendant's negligence was so reckless as to betoken indifference to knowledge. In such case, as in the case at bar, the *tort feasor* is charged with knowledge that human beings are in a perilous situation.

"While decided upon a different ground, the language of the supreme court of West Virginia in *Smith v. Gould,* 110 W. Va. 579, 159 S. E. 53, with reference to the extension of the principle to a case in which the defendant did not actually know of the plaintiff's peril in time to avoid the injury, but in the exercise of reasonable care under the circumstances would have known of the plaintiff's perilous situation in time to have avoided the injury, is pertinent in the case at bar.

" 'It is said that actual knowledge by the defendant of the plaintiff's peril is the *sine qua non* of the doctrine; that the imputed knowledge idea is out of place; that the last clear chance doctrine is founded on the basis of actual knowledge by the defendant of the plaintiff's peril and that a defendant cannot fairly be said to have had a last clear chance to avoid inflicting injury if he did not actually see the peril in time to avoid the injury; that where neither party sees the other there is a situation of concurring negligence; that each owes a duty of lookout; hence no sound basis for recovery by the injured party where the defendant did not actually know the situation. However, the rationale for the extension of the doctrine to a situation wherein the negligent defendant could and should have seen the plaintiff's peril and should have avoided inflicting injury on him is not without its vigorous champions. 45 Corpus Juris, page 990. Such situation is accentuated where there is owing by the defendant to the plaintiff a duty to keep a reasonable lookout commensurate with the instrumentality which he is operating, the locality and attendant circumstances considered.'

"The dissenting opinion in that case cites *Woloszynowski v. New York Central R. Co.,* 254 N. Y. 206, 172 N. E. 471, in which the court said:

" 'The doctrine of the last clear chance, however, is never wakened into action unless and until there is brought home to the defendant to be charged with liability a knowledge that another is in a state of present peril, . . .'

"The remainder of the paragraph from which the

quotation is taken should be quoted. The entire paragraph reads as follows:

" 'The doctrine of the last clear chance, however, is never wakened into action unless and until there is brought home to the defendant to be charged with liability a knowledge that another is in a state of present peril, in which event there must be reasonable effort to counteract the peril and avert its consequences. (*Wright v. Union Ry. Co.*, 224 App. Div. 55 [229 N. Y. S. 162]; 250 N. Y. 526 [166 N. E. 310].) Knowledge may be established by circumstantial evidence, in the face even of professions of ignorance (cf. *Bragg v. Central New England Ry. Co.*, 228 N. Y. 54 [126 N. E. 253]), *but knowledge there must be, or negligence so reckless as to betoken indifference to knowledge.*' (Italics are ours.)"

In *Deitchler v. Ball*, 99 Wash. 483, 170 Pac. 123, we held that, where a man stood on the highway putting up the top of his car when he was struck by the defendant's automobile, it was not necessary for him to pay particular attention to passersby who had plenty of room to avoid him. We said:

"Appellant next argues that the respondent was guilty of contributory negligence. Respondent testified in substance that, while he was putting up the top of his car and fastening the straps over the front to hold the top down, and while he was right up to the car as near as he could stand, he paid no attention to what was going on about him. Naturally this would be true, because, when he was engaged in fastening the top as it should be fastened, in standing close to his car, as he says he was, he had a right to assume that no person would run into him. It was not necessary for him to pay particular attention to passersby who had plenty of room to avoid him. The respondent, no doubt, as contended by the appellant, was required to use ordinary reasonable care for his safety, and if his testimony is to be believed at all, he did so when he was standing close to his car attending to his business, and was not putting himself in the way of danger. The respondent clearly had the right to stop his car

at the place he did, and he clearly had a right to occupy a portion of the paved way in attending to whatever was necessary to be done about his car; and it was the duty of persons coming up to him to so control their cars as not to injure him, especially where there was room to avoid injury, as there evidently was in this case. In the case of *Stephenson v. Parton,* 89 Wash. 653, 155 Pac. 147, quoting from 2 R. C. L. p. 1184, we said:

" ' "If a person is standing in the highway, a driver must notice him and take care not to injure him, and a failure to see a pedestrian in the street may amount to negligence" ' ."

In *Freeman v. Smit,* 193 Wash. 346, 75 P. (2d) 575, we cited *Deitchler v. Ball, supra,* with approval. See, also, annotation of 61 A. L. R. 1164. To the same effect is *Grubbs v. Grayson,* 165 Wash. 548, 5 P. (2d) 1033.

In *Smith v. Seattle,* 172 Wash. 66, 19 P. (2d) 652, a man drove his truck onto the street car tracks and was killed by a street car. A passenger on the street car saw the truck approaching from the right from a point about two hundred and fifty feet distant. The lights were burning on the street car, which was making a great deal of noise. There was nothing to prevent the operator of the truck from seeing the street car. We held that this was a case in which the presumption must be indulged that the decedent used due care, since there was no evidence to the contrary, although it must be conceded that, if the decedent had looked or listened, he would have seen or heard the street car approaching at a rapid rate of speed. In the case at bar, there is no evidence that Mr. Benoit did not look.

*Thornton v. Eneroth,* 177 Wash. 1, 30 P. (2d) 951, involved five successive automobile collisions resulting from Eneroth having stopped his automobile on the highway at a place where neither he nor any of the

142

other automobiles could get off the pavement. We held in that case it was the obstruction created by stopping the first automobile on the pavement that caused all of the other collisions; but in the case at bar, the collision between the Chadwick and Benoit cars was only a condition, and was not any more the proximate cause of their presence on the highway than if Benoit had alighted from his automobile to assist Mrs. Chadwick in repairing a tire or performing any other courteous act. In the case cited, we held that it might be possible for some of the drivers to have so operated their automobiles as to have a collision and not be deemed guilty of negligence, while others might be chargeable therewith; and that whether plaintiff, driving a car in unusual weather conditions and semi-darkness, was guilty of contributory negligence in colliding with another stopped on the pavement, was a question for the jury.

See, also, *Bracy v. Lund*, 197 Wash. 188, 84 P. (2d) 670, in which we considered the question whether the presence of a truck and trailer upon a bridge was a condition rather than a contributing proximate cause to a collision between two automobiles passing each other on the bridge. In that case, the driver of the truck and trailer stopped on a bridge contrary to a city ordinance. We held that he was not guilty of negligence which was the proximate cause of a collision between two passing automobiles where a clear space of twenty-three or twenty-four feet was left free and open for passing cars. All of the lights of the truck and trailer were burning, flares had been placed, and there was a clear view of at least a thousand feet in either direction; the presence of the truck and trailer on the bridge constituted merely a condition and not a contributing proximate cause of the collision.

In *Gooschin v. Ladd,* 177 Wash. 625, 33 P. (2d) 653, we held that the question whether plaintiff was guilty of contributory negligence with reference to the position of his automobile stalled at the side of the road, was a question for the jury. We further held that, even if the left front of the automobile was on the paved portion of the highway, the plaintiff, who was standing alongside of his car, was not a pedestrian within the contemplation of Rem. Rev. Stat., § 6362-41 (6). The present statute (Rem. Rev. Stat., Vol. 7A, § 6360-110) imposes no greater responsibility upon the person stopping an automobile on the highway than the former statute.

In *Karp v. Herder,* 181 Wash. 583, 44 P. (2d) 808, we held that the fact that there was positive testimony that Mrs. Karp did not stop before entering the highway and did not yield the right of way to Herder, did not overcome the presumption that Mrs. Karp, who was killed, did not exercise reasonable care; and that it was proper to instruct the jury that there was a presumption that Mrs. Karp, who was killed entering an intersection, yielded the right of way notwithstanding positive evidence to the contrary. In the case at bar, we repeat, *there is no positive evidence that Mr. Benoit did not look.* We stated in the case cited that the presumption of due care on the part of a deceased person does not apply only where no one witnesses the accident, but that it has its application in all cases and may be strong enough to overcome the testimony of an eye witness. Another apt authority is *Hinton v. Carmody,* 182 Wash. 123, 45 P. (2d) 32, in which we held that the negligence of a motorist in running down and killing a pedestrian crossing the highway at an intersection is a question for the jury where there was evidence that he was driving at an excessive speed

and could have avoided the accident by passing behind the deceased, where there was ample room. We said:

"From the facts shown in the case, if decedent saw the automobile of appellants, she evidently believed she had, and actually did have, ample time to cross its path; in consequence of which, after pausing at the edge of the pavement, she proceeded across the intersection and was struck by the automobile. It had ample room on the paved portion to have avoided her by passing to her rear, but did not. She was on foot. . . .

"Although there is some conflicting evidence on behalf of respondents, the credibility thereof and the probabilities as to their correctness, were for the jury to decide. *Eaton v. Hewitt,* 171 Wash. 260, 17 P. (2d) 906.

"Being an affirmative plea, in the absence of evidence to the contrary, or unless from all the evidence the court can say that the contributory negligence of the person killed was so evident that reasonable minds could not differ thereon, the presumption is that such person exercised due care. *Eaton v. Hewitt, supra; Reinhart v. Oregon-Washington Railroad & Navigation Co.,* 174 Wash. 320, 24 P. (2d) 615; *Smith v. Seattle,* 178 Wash. 477, 35 P. (2d) 27; *Durham v. Crist,* 180 Wash. 213, 38 P. (2d) 1054.

"It is plain that, under our decisions, there is ample and competent testimony to carry the question of negligence of decedent to the jury as a question of fact and could not be taken from the jury as a matter of law."

In *Knutson v. McMahan,* 186 Wash. 518, 58 P. (2d) 1033, we held that, where a pedestrian died shortly after an accident, it is presumed that, even though she was crossing the street in violation of a city ordinance, she was doing so in the exercise of due care and was not guilty of negligence that contributed to the accident. We said that, while she was guilty of negligence as a matter of law, it could not defeat a recovery unless her negligence materially contributed to the accident;

and as she died shortly after the accident, it was presumed that she was doing so in the exercise of due care.

In *Culliton v. Chase,* 174 Wash. 363, 25 P. (2d) 81, and in *Jensen v. Henneford,* 185 Wash. 209, 53 P. (2d) 607, we insisted that the rule of legal stability—we have more than once enunciated the rule from which the majority are now departing—should apply. I now invoke that rule. The facts in the case at bar do not warrant, no valid reason is advanced by the majority for departure therefrom, and there is no justification for, this invasion of the province of the jury.

The judgments should be affirmed.

BLAKE, C. J., MAIN, and GERAGHTY, JJ., concur with MILLARD, J.

