[No. 36494. En Banc. April 16, 1964.]

JESS J. NICHOLS, *Respondent,* v. SPOKANE SAND & GRAVEL CO., *Appellant.**

*Reported in 391 P. (2d) 183.

*H. Earl Davis,* for appellant.

*R. Max Etter* and *Ellsworth I. Connelly,* for respondent.

HAMILTON, J.—On the clear, dry morning of August 23, 1957, defendant's dump truck followed by a pickup truck driven by one Emmet S. Brown, plaintiff's automobile, and a third vehicle driven by one Edward LeDuc were proceeding easterly, in the order named, on Trent Avenue, a two-lane black-top street, in the vicinity of Spokane, Washington. As the vehicles approached Lockwood Street, which dead-ends into Trent Avenue from the north, defendant's truck slowed down to about 10 or 15 miles an hour preparatory to turning left onto Lockwood Street. When the truck commenced its turn, a collision occurred with plaintiff's automobile, which was then in the left-hand lane of travel attempting to pass.

Feeling aggrieved, plaintiff initiated this suit. He alleged, in substance, that defendant's truck driver was negligent in failing to signal his intention to turn or to seasonably observe plaintiff's passing vehicle. Defendant responded, denying negligence on the part of its driver and alleging, in essence, that plaintiff was negligent or contributorially negligent in failing to signal his intention to pass or to observe the truck driver's turn signals. Trial of the action resulted in a jury verdict favorable to plaintiff. Defendant appeals.

The evidence is conflicting as to when and where plaintiff entered the left-hand or west-bound lane of Trent Avenue preparatory to passing the Brown pickup and defendant's truck. Plaintiff testified he entered the west-bound lane 200 to 250 feet from the intersection and remained therein until impact. Defendant's truck driver testified he looked in his rear-view mirror 300 to 450 feet from the intersection, again at 100 feet, and again just before commencing his turn and saw no vehicle in the west-bound lane. He stated he first saw plaintiff's vehicle in the west-bound lane at the moment of turning and impact.

Driver Brown testified plaintiff: "swung out there kind of fast." Driver LeDuc estimated plaintiff started his pass about 50 yards from the intersection.

Likewise, the evidence is in dispute as to whether plaintiff sounded his horn and as to whether the left-turn signal lamps of the defendant's truck were on. Plaintiff testified that he sounded his horn at least once as he commenced to pass the Brown pickup, which he stated was then 30 feet behind the dump truck, and that although he looked the dump-truck turn signals were not on. Driver Brown and the dump-truck operator testified they heard no horn signal from plaintiff's vehicle, and that the dump truck's left-turn signals had been turned on a block to two blocks from the intersection and continued to flash up to the time of the accident.

The basic issues of primary and contributory negligence thus framed were (a) whether defendant's truck driver was negligent in failing to signal his intention to turn or in failing to seasonably observe and avoid plaintiff's passing vehicle, and (b) whether plaintiff was negligent in failing to sound his horn or in failing to observe the truck's turn signals. The trial court submitted these issues to the jury. In addition, the trial court instructed the jury upon the doctrine of last clear chance as follows:

"If you find the plaintiff was guilty of negligence which continued up to the time of the accident, but that the defendant actually then saw the plaintiff in a position of peril and thereafter had time and opportunity to avoid the accident by the exercise of reasonable care, but failed to do so, then, under the doctrine of last clear chance, notwithstanding the negligence of the plaintiff, your verdict must be for the plaintiff." Instruction No. 12.

Defendant assigns error to the giving of this instruction.

■ It is undisputed that the instruction as given states the first phase of the formula for the applicability of the doctrine of last clear chance as pronounced and enunciated in *Mosso v. E. H. Stanton Co.,* 75 Wash. 220, 134 Pac. 941, and *Leftridge v. Seattle,* 130 Wash. 541, 228 Pac. 302. We

have through the years adhered to the formula. In *Left-ridge v. Seattle, supra,* it is spelled out as follows (p. 545):

"Going no farther back into the decisions than to *Mosso v. Stanton Co.,* 75 Wash. 220, 134 Pac. 941, L. R. A. 1916A 943, we find that case endeavored to clarify the last clear chance rule and define two separate conditions under which it was applicable, and the rule is announced as (1) that where the defendant *actually* saw the peril of a traveler on the highway and should have appreciated the danger and failed to exercise reasonable care to avoid injury, such failure made the defendant liable, although the plaintiff's negligence may have continued up to the instant of the injury; but (2) that where the defendant did not actually see the peril of the plaintiff, but by keeping a reasonably careful lookout commensurate with the dangerous character of the agency and the locality *should have seen* the peril and appreciated it in time, by the exercise of reasonable care, to have avoided the injury, and failure to escape the injury results from failure to keep that lookout and exercise that care, the defendant was liable only when the plaintiff's negligence had terminated or culminated in a situation of peril from which the plaintiff could not, by the exercise of reasonable care, extricate himself.

"Thus we have two different situations to which the last clear chance rule applies. In the one, the plaintiff's negligence may continue up to the time of the injury if the defendant *actually sees* the peril; in the second, the plaintiff's negligence must have terminated if the defendant did not actually see the peril, but by the exercise of reasonable care *should have seen* it.

"This rule, as we have said, has been somewhat confused by later decisions which have failed to recognize the distinction between situations where the defendant actually saw and situations where, by the exercise of reasonable care, the defendant should have seen the position of the plaintiff."

In the instant case, the plaintiff does not contend or assert that any negligence on his part, which would render appropriate the doctrine of last chance, *ceased or culminated* in a situation of peril from which he could not, by the exercise of reasonable care, extricate himself. Instead, plaintiff tacitly concedes that such negligence (*i.e.,* failure to maintain a proper lookout or to sound his horn) *con-*

*tinued* up to the time of the accident. He then asserts, in justification of the instruction as given, that the defendant cannot be heard to say that its driver did not see the plaintiff's car since it was there to be seen, and that, therefore, the jury was compelled to find that defendant's driver, in fact, timely saw plaintiff before making his turn.

The plaintiff's theory, insofar as it purports to substitute the duty to see for the requirement of actually seeing, is incongruous with the underlying philosophy of the first phase of the formula for the applicability of the doctrine of last clear chance in this state.

The predicate upon which a plaintiff's relief from the contributory causal relationship of *continuing* negligence rests, via the first phase of the formula, is the defendant's *timely* and *actual knowledge* of plaintiff's negligence and the danger it portends, *coupled with a failure to act upon such knowledge*. It is the defendant's *failure to act, upon timely knowledge* of plaintiff's continuing negligence and peril, which causally supervenes the continuing negligence. The defendant's negligent failure to see the continuing perilous conduct of the plaintiff rises no higher upon the causal ladder than the plaintiff's continuing negligence. It does not supervene it.

Plaintiff, however, contends that the duty of the defendant driver to see that which was there to be seen constitutes a circumstance sufficient in itself to be considered and weighed by the jury against the driver's denial of timely knowledge of plaintiff's presence. Thus, plaintiff argues, the trial court was warranted in submitting to the jury the first phase of the formula. In short, plaintiff contends the prerequisite actual knowledge of defendant's driver may be established by the inference arising from his duty to see.

We have heretofore, in *Thompson v. Porter*, 21 Wn. (2d) 449, 151 P. (2d) 433, and in *Coins v. Washington Motor Coach Co.*, 34 Wn. (2d) 1, 208 P. (2d) 143, discussed a similar contention. In the *Thompson* case, *supra*, we stated (pp. 451, 455, 457):

"That negligence may be proven by circumstantial evi-

dence is so thoroughly settled that, again, we feel that no citation of supporting authority is necessary. It is a rule of necessity; for, when one's negligence depends upon whether or not he saw a thing, no one but he can give direct evidence, and, unless the fact that he did see it can be shown by circumstantial evidence, his statement that he did not see it would completely foreclose the issue.

"...

"It is apparent that, in order to bring the instant case under situation (1), as postulated in the *Leftridge* case [*Leftridge v. Seattle,* 130 Wash. 541, 228 Pac. 302], it was necessary for the plaintiff to introduce evidence which would entitle the jury to find as a fact that defendant Porter '*actually* saw' Thompson's peril, *as distinguished from evidence tending to prove that he should have seen him.* . . . [Last italics ours.]

"...

"It must be kept in mind at all times, however, that, in order to have the case sent to the jury under (1) of the formula laid down in the *Leftridge* case, it was incumbent upon the plaintiff to introduce evidence that Porter '*actually* saw' Thompson; for negligence will not be presumed, and particularly such wanton negligence as knowingly leaving the middle of an unobstructed roadway and running a man down who was walking at its edge."

And, in the *Coins* case, *supra,* we again stated (p. 11):

". . . Even if Kimmel ought to have seen the bus before this time, that fact is not sufficient in itself to raise an inference that he did see it. *Thompson v. Porter,* 21 Wn. (2d) 449, 151 P. (2d) 433. For this reason, we do not think that the situation called for an instruction on the first phase of the rule."

In the instant case, there simply are no physical facts or circumstances in evidence tending to prove anything more than that the defendant's driver *should have seen* plaintiff, unless one assumes such driver wantonly and knowingly turned across the converging path of plaintiff's passing vehicle. Although the evidence would warrant a finding that the driver was primarily negligent in *failing to see* plaintiff's vehicle, it is insufficient to warrant the necessary finding that the driver *actually saw* plaintiff's

vehicle within the contemplation of the first phase of the doctrine of last clear chance.

The trial court erred in giving the challenged instruction.

Defendant next assigns error to the giving of instruction No. 9-A, which reads:

"You are instructed that in this case if you find in the evidence that there are certain physical facts which are uncontroverted and which have a force that overcomes testimony of witnesses which may be to the contrary, then reasonable minds must follow the physical facts and you should, therefore, accept these physical facts and disregard testimony in contradiction thereof."

At its best, such instruction as worded is argumentative. At its worst, it is tantamount to a comment upon the evidence.

In the instant case, the physical location of plaintiff's vehicle moments prior to the collision, as such related to the question of whether defendant's driver knew or should have known of the intended pass, was a principal issue and one very much in dispute. It was plaintiff's theory that his vehicle was in the left-hand lane of travel for a sufficient length of time and distance so that defendant's driver must or should have seen it. Defendant's theory was to the contrary. It was to this particular facet of the case that instruction No. 9-A was admittedly directed.

Where the question of seeing or not seeing another in unobstructed surroundings is the issue, the underlying principle of instruction No. 9-A—that uncontroverted physical facts prevail over contrary oral testimony—usually finds expression in the stock instruction that one will be held to have seen that which is there to be seen. Instruction No. 9-A was immediately preceded by such an instruction (instruction No. 9). Instruction No. 9 advised the jury that a person may not be heard "to testify" that he did not see "an object" which was there to be seen. This instruction, to say the least, amply presented and permitted argument upon plaintiff's theory. The challenged instruction was in this respect repetitious.

A greater vice, however, lies in the fact that instruction No. 9-A, taken in juxtaposition to and with instruction No. 9, literally advised the jury that the testimony of defendant's driver should be disregarded. Thus, rather than performing a function of objectively advising the jury upon the law, it became, instead, a practically unanswerable argument in support of plaintiff's theory. Such is not the function of instructions. *Holmquist v. Grant Cy.*, 54 Wn. (2d) 376, 340 P. (2d) 788. The instruction should not have been given.

The judgment is reversed, and the cause remanded for new trial. Costs will abide the result.

OTT, C. J., HILL, DONWORTH, FINLEY, WEAVER, ROSELLINI, and HALE, JJ., concur.

HUNTER, J. (dissenting)—The primary issue in this case is whether the record supports the trial court's giving instruction No. 12 on the first phase of the last clear chance doctrine. The defendant contends the record is uncontroverted that his driver did not see the plaintiff until the moment of impact and that, therefore, he did not have sufficient time, as a matter of law, in which to act reasonably so as to avoid the accident. The majority agrees with this contention, and it would be correct in its ultimate decision if the testimony of the defendant's driver is accepted to the exclusion of the circumstantial evidence in the record.

However, I agree with the plaintiff that there is circumstantial evidence to controvert the defendant driver's testimony that he did not see the plaintiff until the moment of impact, from which the jury could find he had actual knowledge of the plaintiff's peril in time to have avoided the accident by the exercise of reasonable care.

In *Thompson v. Porter*, 21 Wn. (2d) 449, 151 P. (2d) 433 (1944), we said:

"That negligence may be proven by circumstantial evidence is so thoroughly settled that, again, we feel that no citation of supporting authority is necessary. It is a rule of necessity; for, when one's negligence depends upon whether or not he saw a thing, no one but he can give

direct evidence, and, unless the fact that he did see it can be shown by circumstantial evidence, his statement that he did not see it would completely foreclose the issue."

What then does the record disclose in this regard?

Emmet S. Brown, the driver of the pickup truck which was immediately following the defendant's truck, testified as follows regarding the presence of the plaintiff in the passing lane:

"Q Will you tell us just what happened as you go along there and just what you saw. A At first, preceding the accident, I was traveling along behind a large dump truck. It was filled in with sand or earth material, and at the point just about where we were passing the Drive-In, he turned on his signal indicating that he was going to make a left turn. . . . We finally got on down there a ways further, and there was a grey Pontiac automobile pulled up alongside of me, . . . I observed this car pass the truck with the blinking signal light and there was a collision between the truck and the car. . . . Q As you were going up there, how far would you say this Drive-In Theatre was, to the best of your knowledge if you know, from the intersection of Lockwood there? A Between a block and two blocks. . . . Q About how far was it from the point of impact to the place where you were when the Nichols vehicle started to pass you? A This is kind of like calculus in a way. We were all moving and I know where I was in relation to the truck and that was approximately two or three car lengths behind him when the Nichols car passed me. . . . Q . . . . *Was this movement that was made by Mr. Nichols in his car a sudden turning out, or what could you say with reference to that? A It seemed like he swung out there kind of fast.*" (Italics mine.)

The plaintiff testified as to the point at which he began to pass the defendant's truck:

". . . The pickup truck was approximately 30 feet behind the gravel truck and approximately 225 or 250 feet, I didn't measure it, I couldn't, west of the street called Lockwood Avenue. I turned out to pass the pickup truck and the gravel truck. . . ."

On direct examination, the defendant's driver, Mr. Larson, testified as to when he looked:

"Q Tell us from there on what happened, please, Mr. Larson.. A Well there was a pickup following me and when I got up to the East Trent drivein. And at the time he [pickup truck] was fairly close and about midway of the drivein I turned on my signal lights to make a left turn. Q Before you go on there, do you know how far, or approximately how far this drivein theatre is from the place where the accident occurred? A I would say at least a block and a half. Q All right—A—or possibly more. Q You turned your signals on at that point? A Yes, sir. Q All right— A And I figured the pickup would pass me or drop back and it did drop back and I noticed at the time there was at least one and possibly two cars behind him and they also dropped back. . . . *And at the time I got down to the intersection and I was still watching behind me. I was probably about 15 or 10 miles an hour and I looked in the rear view mirror to see if anyone was coming* and as far as I tell [sic] there was nothing in the lane of traffic and I proceeded to turn and as I started to turn I looked again to make sure and at the time I looked that is when the accident happened." (Italics mine.)

On cross-examination, he testified:

"Q You testified also that you looked in your rear vision mirror and saw certain automobiles behind you? A Yes. Q Is that correct? A Yes. Q When was it that—did you say you first looked in that rear vision mirror at the time you turned on your turn signals, or just after? A I looked before I turned them on. Q That is actually a reflex action to either look up into the mirror and then turn on your signals, or, turn them on and then look up to see if it clear [sic]? One or the other. Isn't that a fact? A Yes. Q When people drive you usually look behind you before you turn on your signals? A Yes. Q Or if you do turn them you look and see? A Yes. Q Isn't that about the size of it? A Yes. Q So either at 300 or 450, a block or a block and a half either 300 or 450 feet? A Yes. Q You, within 300 or 450 feet of this intersection you looked into the mirror and at the same time turned on your signals? . . . A Somewhere in that area. . . . Q *Now, what vision, what area of vision do. you have looking into your rear view mirror, just behind you, excluding the roadway?* Or, just tell us what? A *No, I could see the complete road.* Q *You mean by the complete road, if I understand you correctly, you mean by the complete road, this entire section of the*

*roadway? A Yes. Q Travel coming toward you in opposite directions? A Both ways. . . . Q When was the next time you looked up into your mirror, your rear vision mirror? A Well, I kept watching the mirror all the way along.* Q And what—all the way along. Alright, when was the last time you looked up in the mirror? A Just as I started my turn. Q Just as you started your turn. Did you look— when did you look up to your mirror the time before that? How far were you from the intersection? A Approximately 100 feet. Q When you were about 100 feet from the intersection you looked into the mirror? Is that correct? A Yes. Q Did you see any traffic attempting to pass you? A No, sir. Q You didn't A No. Q And when you looked into the mirror at that time, 100 feet from the intersection, what did you see behind you? A I saw the pickup and either two or three cars. I couldn't tell for sure." (Italics mine.)

From this record the jury could have found the plaintiff was negligently inattentive to the left-turn signal of the defendant's driver and to the peril in proceeding to pass the defendant's truck.

Although the defendant's driver denied seeing the plaintiff's car in the passing lane, the jury could have found from circumstantial evidence that the defendant's driver observed the plaintiff continuously from the time he turned out to pass. It could have further found that the defendant's driver realized or had reason to realize from the plaintiff's conduct his inattention to the left-turn signal of the defendant's driver and to the peril in proceeding, in time for the defendant's driver to have avoided the collision by not making the left turn; that the defendant's driver negligently made the left turn when, by the exercise of reasonable care, he had the time and opportunity of not doing so and thereby avoiding the accident.

The foregoing facts bring this case within the third category of the last clear chance doctrine, as stated by 2 Harper and James, Law of Torts § 22.13:

"The last clear chance doctrine has been applied in the United States to cases which fit into one of the four following categories:

"   .   .   .

"(3) Where plaintiff himself could avoid danger by checking his approach to it or by stepping out of its path but fails to do so because of negligent inattention, and defendant knows plaintiff's position and realizes or has reason to realize his inattention, and after such knowledge and (actual or constructive) realization could have avoided injury by the use of reasonable care."

In support of this rule Harper and James, *supra* cite 2 Restatement of Torts § 480, which states the same rule as follows:

"A plaintiff who, by the exercise of reasonable vigilance could have observed the danger created by the defendant's negligence in time to have avoided harm therefrom, may recover if, but only if, the defendant

"(a) knew of the plaintiff's situation, and

"(b) realized or had reason to realize that the plaintiff was inattentive and therefore unlikely to discover his peril in time to avoid the harm, and

"(c) thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff."

The foregoing statements are consistent with the first phase of the last clear chance doctrine in this state, as announced in *Leftridge v. Seattle,* 130 Wash. 541, 228 Pac. 302 (1924). 92 A.L.R. 66 states in part:

"The first proposition of the Washington formula, which, as above shown [*Leftridge v. Seattle, supra*], permits the application of the doctrine notwithstanding the continuance of the injured person's negligence *if the defendant actually discovered the situation and should have appreciated the danger in time, by the exercise of reasonable care, to have enabled him (defendant) to avert the accident, is in harmony with the statement in the American Law Restatement of Torts* (Tentative Draft No. 10) chap. 8, § 16 [§ 480, official draft]. . . ." (Italics mine.)

The trial court was justified in submitting instruction No. 12 to the jury.

The judgment of the trial court entered upon the verdict should be affirmed.