[No. 20-40317-2.   Division Two.   October 30, 1969.]

FRANK G. LEE, *Respondent*, v. COTTEN BROTHERS COMPANY
*et al., Appellants.*

*Batali, Combs, Small & Kucklick* and *Jerome F. Combs,* for appellants.

*Eisenhower, Carlson, Newlands, Reha & Sinnitt* and *Paul E. Sinnitt,* for respondent.

PEARSON, J.—Defendants appeal from an adverse verdict and judgment in an action for damages brought by plaintiff

for wrongful death of his 19-year-old son, Franklin Y. Lee. The fatal accident occurred at about 4:15 p.m. on March 16, 1967 on Interstate 5, a short distance north of the South 56th Street overpass, within the city limits of Tacoma.

The plaintiff's complaint alleged negligence on the part of defendant driver, Chad H. Hunt, who was at the time of the accident driving a logging truck within the scope of his employment for the defendant, Cotten Brothers Co., Inc. Defendants' answer denied negligence and affirmatively alleged contributors negligence of the deceased.

The trial court submitted the case to the jury on the issues of negligence, contributory negligence, and both phases of the last clear chance doctrine.

Defendants assign as error: (1) the refusal of the trial court to direct a verdict in their favor, (2) instructing the jury on both phases of the last clear chance doctrine, (3) instructing the jury that one is charged with the duty of seeing that which he would have seen had he been exercising ordinary care, and (4) refusing to give a sudden emergency instruction.

The first three assignments of error require a detailed review of the testimony, which must be considered in the light most favorable to the plaintiff.

The following operative facts were establshed by the testimony of four independent witnesses, the state trooper, and defendant's driver. These facts were not in substantial dispute. Interstate 5 is a 60-mile-per-hour freeway which had at that time three southbound driving lanes. It proceeded in a westerly direction for southbound traffic until, in the vicinity of the South 38th Street interchange, it made a 90-degree turn to the south. Shortly after this turn in the freeway, southbound vehicles proceed under an overpass for 38th Street traffic. One-half mile further south there is a similar overpass for South 56th Street traffic. The significant operative facts occurred in this half-mile stretch between the two overpasses.

All four witnesses and the defendant's driver testified

that as they proceeded through the southerly turn of the freeway, they encountered sudden heavy winds and rain which obscured visibility ahead to from three to five car lengths. Traffic was very heavy at the time. All witnesses agreed that the full force of the storm was not felt until they had turned south in the vicinity of the 38th Street overpass.

The entire series of events which occurred was precipitated when the decedent, Franklin Y. Lee, operating a Ford Falcon automobile southerly on Interstate 5, lost control of the vehicle when he had reached a point about one-half of the distance between the 38th Street and 56th Street overpasses. His vehicle commenced spinning in the inside lane of traffic.

The only witness to observe Lee lose control of his vehicle was John J. Karuza, a friend of Franklin Y. Lee, who was preceding Lee in the inside lane about four or five car lengths ahead. He testified that when the force of the storm was felt he and the Lee vehicle slowed from 55 miles per hour to 40 miles per hour. The wind moved his vehicle toward the guard rail. Looking through his rear-vision mirror, he observed the Lee vehicle spin around and strike a guard rail, which is situated on the extreme easterly boundary of the southbound lanes. It came to rest partly in the inside lane of traffic and partly in an emergency storage lane which lies immediately to the east of the inside driving lane.

Karuza immediately moved his vehicle off the freeway to the right and commenced backing up toward the scene of the accident to render assistance. As he was backing up, he observed Lee alight from his vehicle and walk to the rear of it. At this point he observed defendant's logging truck (as somewhat of a blur) sliding down the guard rail, striking Franklin Lee and colliding with the left side of the Falcon automobile. This witness immediately ran across the freeway to render assitance. He noticed that the motor of the Falcon was running, it was in neutral gear, the emergency brakes were on, the headlights and windshield wip-

ers were still operating, and the tires were inflated. There was substantial damage to the left rear corner and left side.

Leonard J. Kellar, in a 1966 GMC pickup truck with canopy, was also driving in the inside lane at an estimated speed of 40 to 45 miles per hour. He first observed the Falcon automobile up against the guard rail and stopped completely in the emergency storage lane. As he approached, he observed the Falcon automobile drive out partly into his lane and stop. Five or six other cars ahead of him switched to the middle lane to avoid striking the Falcon.

Kellar, believing it not safe to shift lanes because of heavy traffic, stopped his vehicle in the inside lane about 15 feet to the rear of the Falcon and turned on automatic flashers. Immediately he observed the driver get out of the Falcon automobile and walk to the rear of it. At this point he heard a racket coming from behind, whereupon he observed defendant's logging truck skidding along the guard rail. This truck passed his vehicle to the left and collided with Lee and his automobile.

Prior to the fatal accident, two other vehicles had come up behind Kellar's pickup truck and stopped in the inside lane.

Harrison Clark, in a 1962 Buick, had entered the freeway at the Pacific Avenue interchange. He arrived at that interchange at approximately the same time as defendant's logging truck. He accelerated to 70 miles per hour in order to pass the truck. When he arrived at the southerly turn of the freeway, he encountered the storm and could only see three to four car lengths. When he arrived at the 38th Street overpass, defendant's truck was in the middle lane and about 200 yards behind him. Approximately halfway between the 38th Street and the 56th Street overpasses, he began to see brake lights flash on and he brought his vehicle to a quick stop immediately behind the Kellar pickup truck. At this point he observed the Ford Falcon substantially blocking the inside lane. He observed Lee alight from

the Falcon and walk to the rear. Lee was looking over the rear end of his vehicle, when defendant's truck passed Clark's Buick on the left and slid into Lee and his automobile.

Paul Tingstad, in a 1964 Pontiac, had moved into the inside driving lane at about the 38th Street interchange. His speed was about 40 miles per hour. Tingstad also observed the stop lights on vehicles ahead and brought his Pontiac to a stop approximately 15 feet behind the Buick automobile. Immediately after he stopped, the back end of his car was struck by the logging truck, which he then observed sliding along the guard rail. He was not in a position to observe the impact with the deceased or his automobile, because of the intervening car and truck. This witness created some confusion in the case by placing the location of his stopped vehicle on plaintiff's exhibit 1 (a scale diagram of the scene of the accident), some 400 feet north of the area where all of the other witnesses located the scene of the accident. This placement did not coincide with his own testimony as to the distance he stopped behind the Buick, nor did it coincide with the placement of his vehicle on the map by the state patrol officer who arrived at the scene approximately 15 minutes after the accident. When this confusion was called to his attention, he testified that either the map looked too long or the automobiles drawn in were too small, since he was definitely under the impression that he had stopped near the northerly edge of the emergency storage lane and the accident occurred near the southerly end of that lane. The diagram showed that the emergency storage lane was some 500 feet in length from its beginning to its terminus.

The defendant driver testified that he had entered Interstate 5 at the Port of Tacoma interchange and for some distance prior to the accident had been driving in the middle or center lane for southbound traffic. His Kenworth logging truck, weighing 23,000 pounds had the trailer nestling above the cab. His lights were on and visibility became poor at the time he arrived at the 38th Street over-

pass. He believed that his speed as he rounded the southerly turn was about 60 miles per hour. When he observed brake lights in the middle lane ahead of him, he feathered the brakes and realized that he would not be able to stop. To avoid striking the car in the middle lane, he turned to the inside lane and at this point saw the Pontiac, stopped two or three car lengths ahead. To avoid striking the Pontiac, he steered the logging truck into the emergency storage lane and at this stage he believes he was traveling at about 50 miles per hour. He was unable to completely avoid striking the Pontiac and his truck slammed against the guard rail. At this point he again applied the brakes and while skidding helplessly along the guard rail saw the boy alight from the Falcon and attempt to jump out of his way.

With reference to his ability to see, defendant's driver testified that the cab of his truck was sufficiently high to permit him to see over regular passenger automobiles, but that visibility was four to five car lengths. He testified that he might have been able to see the Lee vehicle when he first observed the stopped Pontiac, but testified that he was watching the Pontiac in an attempt to avoid striking it. There is no question that he was completely out of control after striking the Pontiac.

At this point the confusion created by witness Tingstad, placing his stopped Pontiac some 400 feet to the north of the impact point, becomes apparent. If it was in that position, then defendant's truck would have been skidding along the guard rail out of control in the emergency bay lane for almost 400 feet before coming into contact with the deceased and his automobile.

The state patrol officer, Trooper Riepe, had been approximately 5 miles south of the accident scene when he received the call. He testified that it had been about 4:15 p.m. when the heavy rain commenced and he arrived at the scene about 4:30 p.m. When he arrived at the scene he observed multiple accidents in all lanes of traffic, which had occurred between the time of the first accident and the time of his arrival. On the scale diagram he placed the

Tingstad Pontiac approximately 60 feet to the north of where he positioned plaintiff's Falcon. He placed the Falcon automobile, protruding halfway into the inside lane and halfway into the emergency storage lane.

There was no satisfactory testimony as to the time lapse which occurred from the time the Lee vehicle spun out of control until it was struck by the logging truck.

The overwhelming testimony was to the effect that defendant's truck was partially out of control when it reached a point approximately two to three car lengths behind the Pontiac and was completely out of control thereafter until the accident occurred. All the witnesses placed the defendant's truck wholly within the emergency lane at the time of the accident.

Defendants claim that this case should not have been submitted to the jury on either phase of the last clear chance rule and in particular it should not have been submitted on both phases at the same time. Defendant does not contend that the form of the instructions was wrong.

■■ Repeatedly, the Supreme Court has defined two separate conditions under which the last clear chance is applicable:

(1) Where the defendant *actually* saw the peril of a traveler on the highway and should have appreciated the danger and failed to exercise reasonable care to avoid injury, such failure made the defendant liable, although the plaintiff's negligence may have continued up to the instance of the injury; but

(2) Where the defendant did not actually see the peril of the plaintiff, but by keeping a reasonably careful lookout commensurate with the dangerous character of the agency and the locality *should have seen* the peril and appreciated it in time, by the exercise of reasonable care, to have avoided the injury, and failure to escape the injury results from failure to keep that lookout and exercise that care, the defendant was liable only when the plaintiff's negligence had terminated or culminated in a situation of peril from

which the plaintiff could not, by the exercise of reasonable care, extricate himself.

*Nichols v. Spokane Sand & Gravel Co.,* 64 Wn.2d 219, 391, P.2d 183 (1964); *Patterson v. Krogh,* 51 Wn.2d 73, 316 P.2d 103 (1957); *Thompson v. Porter,* 21 Wn.2d 449, 151 P.2d 433 (1944); *Leftridge v. Seattle,* 130 Wash. 541, 545, 546, 228 P. 302 (1924).

In *Leftridge* the court stated:

> Thus we have two different situations to which the last clear chance rule applies. In the one, the plaintiff's negligence may continue up to the time of the injury if the defendant *actually sees* the peril; in the second, the plaintiff's negligence must have terminated if the defendant did not actually see the peril, but by the exercise of reasonable care *should have seen* it.

> This rule, as we have said, has been somewhat confused by later decisions which have failed to recognize the distinction between situations where the defendant actually saw and situations where, by the exercise of reasonable care, the defendant should have seen the position of the plaintiff.

As we can see, the first phase of the rule will excuse plaintiff's "continuing" negligence where defendant's *timely* and *actual* knowledge of plaintiff's negligence and the danger it portends is coupled with a failure to act upon such timely knowledge. *Nichols v. Spokane Sand & Gravel Co., supra.*

Where the defendant testifies that he does not see plaintiff's peril, the requirement of actual knowledge may be established by circumstantial evidence. However, testimony that a defendant *ought to have seen* plaintiff's peril may not be substituted so as to raise an inference that he did see it. *Thompson v. Porter, supra.*

▪ Both phases of this rule require more than a last possible chance to avoid a collision. A *"last clear chance"* involves the element of sufficient time to appreciate the peril of the negligent plaintiff (or his inability to extricate himself) and to take the necessary steps to avoid injuring

him. *Everest v. Riecken,* 30 Wn.2d 683, 193 P.2d 353 (1948); *Sarchett v. Fidler,* 37 Wn.2d 363, 223 P.2d 843 (1950).

■ We can envision particular factual situations which are subject to two or more interpretations so as to require the jury to consider both phases of this rule to determine which, if either, is applicable. *Chapin v. Stickel,* 173 Wash. 174, 22 P.2d 290 (1933); *Patterson v. Krogh, supra.*

We must determine if the facts of this case would warrant the jury to find under one view of the evidence that plaintiff's continuing negligence should be excused where defendant's timely and actual knowledge of plaintiff's negligence is coupled with defendant's failure to act upon such timely knowledge; and under another view of the evidence that plaintiff's negligence has terminated or culminated in a position of peril that defendant has not timely observed but in the exercise of reasonable care should have observed in time to have avoided the collision.

We think that a mechanical approach to the application of the rule should be avoided (although the temptation is great to use that approach) and that we should consider the application of either phase of the rule in light of its purpose.

With this in view, we consider the applicability of phase one to the facts of this case. The purpose of this phase of the rule is obvious. Contributory negligence should not bar recovery to a *negligent* plaintiff who is oblivious of his peril where a defendant sees his negligence in time to avoid its consequences by exercising reasonable care. Any other view would condone willful or wanton injury. *Thompson v. Porter, supra.* But, under this phase of the rule, if you simply have a negligent plaintiff and a defendant who is negligent because he fails to see the negligent plaintiff, one is guilty of no more than the other and the contributory negligence of the plaintiff should not be excused.

This is why, to invoke this phase of the rule, the plaintiff must introduce evidence which would entitle the jury to find as a fact that defendant, Hunt, actually saw Lee's peril, as distinguished from evidence tending to prove that he

should have seen him. Such actual knowledge must be from a point where defendant had a last clear chance to avoid the collision.

We do not believe that plaintiff sustained this burden. The testimony was undisputed that the weather conditions existing at the place of the accident restricted the actual visibility to from three to five car lengths. The evidence further shows without dispute that defendant's vehicle was partially or completely out of control for more than that distance. If we are to assume that defendant's speed and inability to stop made it necessary for him to transfer from the middle lane to the inside lane to avoid a stopped vehicle there, and that he entered the emergency storage lane in a futile attempt to avoid a Pontiac which was stopped in the inside lane, and that from that point on his wheels were locked and his truck was sliding along the guard rail, then he had *no* chance to avoid the collision from the beginning of his actual awareness to the time the fatal accident occurred.

Nor can we accept the argument that the jury was entitled to infer timely and actual knowledge by defendant of plaintiff's peril, from the fact that other drivers saw him in time to stop. This would create no greater inference than that defendant *should have seen* the situation sooner. *Schroeder v. Taylor*, 70 Wn.2d 1, 422 P.2d 21 (1966). Even that inference might be unreasonable unless it were established that all vehicles approaching the emergency area were equally spaced.

While we think the evidence may have warranted the jury in finding that the defendant driver was negligent in not seeing the emergency situation sooner, we think it was not sufficient to warrant a finding that he *actually did see* it. For this reason, it was error to instruct on this phase of the rule.

We believe that additional error was committed by the giving of instruction 11, which stated: "One is charged with the duty of seeing that which he would have seen had he been exercising ordinary care."

■ When this instruction is given in conjunction with the first phase of the last clear chance rule, it tends to substitute the *duty of seeing* with *actually seeing* and for that reason converts that portion of the first phase into the second phase of the rule. At the very least, it confused the issue and should not have been given.

The Supreme Court has stated that such an instruction is properly given where the presence of an object is established and a party testifies that he looked and did not see it, when he must have seen it had he looked. *Landeis v. Poole,* 69 Wn.2d 515, 418 P.2d 717 (1966); *Dingwall v. McKerricher,* 75 Wn.2d 352, 450 P.2d 947 (1969).

We hold that where view of the object is in doubt or dispute, as it was in this case, because of extreme weather conditions, the instruction is misleading and should not be given. *Schroeder v. Taylor, supra.*

We now turn to the second phase of the last clear chance rule and its applicability to the facts of this case. The purpose of this phase is to excuse the antecedent negligence of a helpless plaintiff who has, through such negligence, become powerless to escape from a perilous predicament. He may, under these limited circumstances, recover from a defendant who should have seen his predicament in time to avoid injuring him. The purpose of this phase of the rule is to soften the harsh effects of contributory negligence where the plaintiff is helpless because of his negligence and where reasonable care would avoid his injuries.

We have no difficulty in determining that the deceased's negligence placed him in a perilous predicament and that his negligence had culminated (if not terminated) in that position. His vehicle (whether actually driven there or ending there after colliding with the guard rail) was partially blocking the fast lane of the freeway under extremely poor visibility conditions and at a time of heavy traffic. His peril was perhaps increased when he alighted from the vehicle, although this is problematical if he was standing in the emergency storage lane. Whether he could have extricated himself from the peril by driving his vehicle from its

position, was certainly a question for the jury who could have determined that it was disabled.

The extreme hazard created by the position of his vehicle was manifested by testimony of the state trooper that this accident had obviously caused a chain reaction of accidents blocking all three lanes of the freeway.

We also have no difficulty in determining that there was an issue for the jury as to the defendant's negligence in exceeding a safe speed for the conditions existing and in failure to make timely observation that vehicles ahead of him were stopped or stopping.

Was the jury warranted in inferring that from the point defendant should have been aware of plaintiff's predicament, he had and failed to exercise a last clear chance to avoid the collision?

It is our view that the evidence most favorable to the plaintiff does not disclose a clear opportunity for defendant to avoid the accident, unless his antecedent negligence, if any, may be considered in determining whether or not he had and failed to exercise such opportunity.

We do not find that to be the law.

■ In order that the defendant be liable under phase two of the rule, it is necessary that after he has discovered or should have discovered the plaintiff's peril, he have the ability to avert the accident if he acts with reasonable care. If the defendant, after discovering the plaintiff's peril, does all that can reasonably be expected of him, the fact that his efforts are defeated by antecedent lack of preparation or a previous course of negligent conduct is not sufficient to make him liable.

The rule is stated in Restatement (Second) of Torts § 479 (1965) at 534:

> If, after the plaintiff is in peril, the defendant does all that he can reasonably be expected to do to exercise his *then* existing ability to discover the peril, the fact that he is prevented from doing so by his own prior negligence does not give him the "last clear chance," since his negligence is not later in time than that of the plaintiff.

(Italics ours.)

This facet of the rule is the law of Washington. *Stokes v. Johnstone*, 47 Wn.2d 323, 287 P.2d 472 (1955); *Shiels v. Purfeerst*, 39 Wn.2d 252, 235 P.2d 161 (1951); *Shultes v. Halpin*, 33 Wn.2d 294, 205 P.2d 1201 (1949); *Landeis v. Poole*, 69 Wn.2d 515, 418 P.2d 717 (1966); *Bergstrom v. Ove*, 39 Wn.2d 78, 234 P.2d 548 (1951); *Myers v. West Coast Fast Freight, Inc.*, 42 Wn.2d 524, 256 P.2d 840 (1953); *Roloff v. Bailey*, 46 Wn.2d 358, 281 P.2d 462 (1955).

Applying that facet of the rule to this case, defendant was confronted by an emergency created by the actions of decedent in losing control of his automobile. Under the most favorable view (to plaintiff) of the testimony, visibility was reduced to no more than five car lengths (approximately 100 feet). Such reduced visibility occurred within one-half mile of where cars commenced stacking up.

When defendant came upon the scene (even assuming an excessive speed) he did all that he could to avoid a collision with a car in the middle lane, or the Pontiac in the inside lane, and was out of control thereafter. He simply failed in his effort to escape the natural results of the emergency created by deceased. *Shiels v. Purfeerst, supra.*

His antecedent negligence, if any, in exceeding a safe speed or failure to keep a proper lookout may not be used under those circumstances to establish that he *would have had* a last clear chance to avoid the fatal accident.

In *Shiels v. Purfeerst, supra* (en banc decision) a pedestrian created an emergency by crossing a highway where there was no crosswalk. Defendant driver, admittedly speeding, failed to avoid striking the pedestrian, although skidding some 120 feet. To the argument that the last clear chance doctrine was available, the court stated at 256:

> One may violate the rules of the road and still have a last clear chance to avoid a collision, but any lessening of control of one's car resulting from such a violation also detracts from the clearness of his opportunity to avoid a collision. Thus, the higher the *speed* of the defendant, the greater is the distance needed for a last clear chance to stop. Hence, a showing of antecedent negligence, which need not be shown under last clear chance, may in some

instances make the doctrine inapplicable. This would be true where the antecedent negligence of both parties created a situation where an injury could not be avoided.

(Italics ours.)

Similarly, in *Bergstrom v. Ove, supra,* the defendant drove over the crest of a hill where the road was icy. At the bottom of the hill he observed a stalled automobile which had skidded out of control, blocking the roadway. Defendant applied his brakes and skidded 175 feet down the road in a futile attempt to stop. The last clear chance rule was held inapplicable as a matter of law.

*Landeis v. Poole, supra,* involved a passing defendant and a left-turning plaintiff with a disputed issue as to whether or not plaintiff was signaling his turn. When plaintiff moved across the center line, defendant tried to stop, but the highway was slippery. He chose a rear-end collision rather than attempting to pass to the right. The court states at 518:

> When the evidence most favorable to a plaintiff does not disclose a clear opportunity for defendant to avoid the accident, the doctrine of last clear chance is not applicable. Where a defendant is confronted by an emergency created by the negligence of the plaintiff, and he does what he can to avoid an injury, he is not liable under the doctrine of last clear chance, even though his course of action is not the wisest choice, and though he is unsuccessful. [citing cases] The doctrine implies thought, appreciation, mental direction and the lapse of sufficient time to act effectually upon the impulse to avoid injury; [citing cases].

We believe these rules to be applicable in this case to prevent the use of the last clear chance doctrine to avoid contributory negligence. The second phase of last clear chance will not apply where the evidence fails to disclose a last *clear* chance to avoid the accident.

We do not agree, however, that a directed verdict for the defendant was warranted. There was evidence by which the jury could infer that the decedent was off the driving portion of the roadway at the time he was struck. *Cockle v.*

*General Elec. Co.,* 70 Wn.2d 846, 425 P.2d 665 (1967); *Chadwick v. Ek,* 1 Wn.2d 117, 95 P.2d 398 (1939). There is likewise evidence by which the jury might find that the suddenness of the storm and reduced visibility caused decedent to lose control through no fault of his own and that his vehicle was disabled thereafter. (The testimony of Karuza that the force of the sudden wind pushed his car toward the guard rail and that at the same time he observed Lee lose control, may give rise to this inference.) There is likewise evidence by which the jury might find that defendant was exceeding a safe speed for the conditions existing and failing to keep a reasonable lookout.

We believe that negligence and contributory negligence were properly submitted to the jury under the instruction given on those issues.

▮ Lastly, should the court have instructed on the sudden emergency doctrine? We believe that such an instruction is warranted if there is a reasonable inference that the emergency was not a product of defendant's own negligence in whole or in part. *Sonnenberg v. Remsing,* 65 Wn.2d 553, 398 P.2d 728 (1965).

We believe such an inference was reasonable and that the instruction should have been given. When four independent witnesses testify as they did, to a sudden and substantial reduction in visibility as they turned south on the freeway, and where one vehicle is spun out of control by the force and intensity thereof (a reasonable inference), the jury is entitled to find that the defendant was faced with such an emergency not of his making, when confronted by these factors together with vehicles ahead of him stopped in all lanes of a 60-mile-an-hour freeway.

Accordingly, the judgment is reversed, with directions to grant a new trial.

ARMSTRONG, C. J., and PETRIE, J., concur.